IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

THE ESTATE OF BETTY SUE DUNN GRAY,
Wilburn Gray, as Administrator of the Estate of
Betty Sue Dunn Gray; WILBURN GRAY, individually
and on behalf of all Wrongful death beneficiaries of
Betty Sue Dunn Gray; RONNIE BROWN,
individually and on behalf of all Wrongful
death beneficiaries of Betty Sue Dunn Gray;
WILLIAM BROWN, individually and on behalf
of all Wrongful death beneficiaries of
Betty Sue Dunn Gray                                                                    PLAINTIFFS

V.                                                                  CAUSE NO.: 1:15CV061-SA-DAS

SCOTT DALTON, individually and in his
official capacity as officer for the Alcorn County
Sheriff's Department; CHARLES RINEHART,
in his official capacity as Sheriff of Alcorn County,
Mississippi and as supervisor of Scott Dalton;
ALCORN COUNTY, MISSISSIPPI, a political
subdivision of the State of Mississippi; and
JOHN DOES 1-10                                                                         DEFENDANTS

MEMORANDUM OPINION

Defendants filed a Motion for Summary Judgment [116] seeking a summary adjudication of Plaintiffs' claims. After reviewing the entire record, arguments by counsel, case law, rules and authorities, the Court finds as follows:

*Factual and Procedural Background*

Wilburn and Betty Sue Gray, a mid-sixties couple, resided on County Road 100 during December of 2013. Betty's son, Wilburn's stepson, Ronnie Brown lived close and often came over for dinner. On December 23, Brown asked Wilburn if he could borrow his truck but Wilburn refused citing his concern about Brown's lack of drivers' license and suspected drug use. In retaliation, Ronnie Brown assaulted Wilburn Gray. As he was leaving the house, Brown

told Gray he would be back shortly and threatened to cause physical damage to his truck at that time. Wilburn Gray called 911 and told the dispatcher that he did not have an emergency but wished to talk to a deputy about a problem he was having with his stepson. He informed the dispatcher that his stepson was not currently at his house.

At around 7:15 pm, the 911 dispatcher called for a deputy to go take the report of the disturbance at Gray's address. Deputy Scott Dalton responded that he was on his way to the address. As the call was not of an emergency nature, Dalton did not use blue lights or sirens to signal his approach. He parked his cruiser behind an SUV parked in the carport of the Gray house. After returning a text from his wife, Deputy Dalton contends he could see two people sitting in recliners through the front window of the Gray residence. There were no outside lights or street lights, and the house was lit from within. Dalton approached the house door off of the carport by walking between the SUV parked in the carport and the house. The door to the interior of Gray's house is located in the upper right hand corner of the wall to the right of the parked SUV. Dalton claims the glass door which opens into the carport was closed, but the wood door behind the glass door, which opened into the house, was open.

The facts as relayed by both parties vary wildly from this point.

Dalton claims he was approached by Betty Gray who opened the glass door and spoke to him. Deputy Dalton stated that he told Betty Gray that he was with the Sheriff's Department at that time. Dalton also contends that at that angle, Dalton could see Wilburn Gray sitting in his recliner. He reported seeing Wilburn Gray reach over to a side table, grab a gun, and cock it. Dalton submits that he warned Wilburn Gray to put down the gun and told Wilburn Gray that he was with the Sheriff's Department at least three times before Wilburn Gray "came very aggressively toward the door." Dalton then pulled his duty weapon and fired two shots as Dalton

2

was backing away from the carport door. Gray reached around the busted glass door frame and shot at Dalton twice.

Wilburn Gray's version of the facts starts after he called 911 and requested a deputy come out to take his report. Gray contends he heard something outside and assumed it was his stepson returning to damage his pick-up truck. According to Gray, he retrieved his pistol from above his refrigerator where it was kept in a holster and told his wife Betty that he was going to fire a warning shot to scare Ronnie Brown off. When he went to open the glass door into the carport, a bullet shot the glass out of the door. Reflexively, Gray shot his gun. He then heard another officer, later identified as David Harrison, yelling at him to put his gun down. Gray contends he never heard or saw Deputy Dalton before he was arrested. He did not know an officer was in his carport when he went to the door. Gray claims he never heard Dalton say he was with the Sheriff's Department or heard Dalton ask for him to put his weapon down or to get down until after he shot.

Deputy Dalton's dashboard camera recorded the incident. From the angle of the dash cam, however, it is unclear whether Dalton saw or talked with anyone. The only clearly audible statement is Dalton yelling, "Drop the goddamn gun" immediately prior to his shooting his weapon.

One of Deputy Dalton's shots hit Wilburn Gray's wife, Betty, in the neck. After extensive medical intervention, Betty Sue Gray died on July 29, 2014 of complications from the gunshot wound.

Wilburn Gray was arrested and charged with assault on a police officer and spent December 23 through December 26, 2013, in jail before being afforded a bond.

3

Wilburn Gray, Ronnie Brown, and William Brown, on behalf of themselves, The Estate of Betty Sue Gray, and the other wrongful death beneficiaries, filed this lawsuit claiming that the shooting of Betty Gray was an excessive and unnecessary use of deadly force, the Sheriff failed to properly train and supervise Dalton regarding the use of deadly force, and Wilburn was wrongly arrested and detained. After significant discovery, the Defendants filed the Motion for Summary Judgment. Plaintiffs responded, and the motion is ripe for review.

*Summary Judgment Standard*

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010). "Where the burden of production at trial ultimately rests on the nonmovant, the movant must merely demonstrate an absence of evidentiary support in the record for the nonmovant's case." *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010) (punctuation omitted). The nonmovant "must come forward with specific facts showing that there is a genuine issue for trial." *Id.* (punctuation omitted). "An issue is material if its resolution could affect the outcome of the action." *Sierra Club, Inc.*, 627 F.3d at 138. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Cuadra*, 626 F.3d at 812.

The Court is not permitted to make credibility determinations or weigh the evidence. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009). When deciding whether a genuine fact issue exists, "the court must view the facts and the inference to be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc.*, 627 F.3d at 138. However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated

4

assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002).

*Discussion and Analysis*

1. <u>Fourteenth Amendment Excessive Force Claim against Dalton by the Estate</u>

Dalton, sued in his individual capacity, seeks summary judgment on the basis of qualified immunity as to Plaintiffs' claim of excessive force on behalf of Betty Gray.

Section 1983 provides a remedy "to those who suffer, as a result of state action, deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States." *White v. Thomas*, 660 F.2d 680, 683 (5th Cir. 1981). Section 1983 claims may be brought against government employees "in their individual or official capacity . . . ." *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009). But individual defendants may rely on the defense of qualified immunity. *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 436 (5th Cir. 2008).

Generally, "qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). "Although nominally an affirmative defense, the plaintiff has the burden to negate the defense once properly raised." *Poole v. Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (citation omitted).

"[T]he usual summary judgment burden of proof is altered in the case of a qualified immunity defense." *Wolfe v. Meziere*, 566 F. App'x 353, 354 (5th Cir. 2014) (citing *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005); *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001)). "An officer need only plead his good faith, which then shifts the

burden to the plaintiff, who must rebut the defense by establishing that the officer's allegedly wrongful conduct violated clearly established law." *Id*. The plaintiff "cannot rest on conclusory allegations and assertions but must demonstrate genuine issues of material fact regarding the reasonableness of the officer's conduct." *Id*. "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (citations omitted). Although factual controversies are to be resolved in favor of the nonmoving party, the court will do so only "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Id*. Accordingly, the court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts" to survive summary judgment. *Id*. (citing *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990)); *Salazar-Limon v. City of Houston*, 826 F.3d 272, 277 (5th Cir. 2016).

There are two steps in the Court's qualified immunity analysis. First, the Court determines whether the plaintiff "has adduced sufficient evidence to raise a genuine issue of material fact suggesting [the defendant's] conduct violated an actual constitutional right." *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008). Second, the Court must "consider whether [the defendant's] actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Id.* The Court has discretion to address either step first. *Pearson*, 555 U.S. at 236, 129 S. Ct. 808. "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Brumfield*, 551 F.3d at 326 (punctuation omitted).

6

A law enforcement officer's use of excessive force in the course of an arrest, investigatory stop, or other "seizure" of a free citizen violates that citizen's constitutional rights under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Whether a Fourth Amendment seizure has occurred is central to the determination of liability arising from police-applied force. "All claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham*, 490 U.S. at 395, 109 S. Ct. 1865. However, the Fourth Amendment "reasonableness" standard does not apply to Section 1983 claims which seek remuneration for physical injuries *inadvertently inflicted upon an innocent third party* by police officers' use of force while attempting to seize a perpetrator, because the authorities could not "seize" any person other than one who was a deliberate object of their exertion of force. *Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989). Rather, constitutional tort claims asserted by persons collaterally injured by police conduct who were not intended targets of an attempted official "seizure" are adjudged according to substantive due process norms. *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1714–16, 140 L. Ed. 2d 1043 (1998); *United States v. Lanier*, 520 U.S. 259, 272 n. 7, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997) (due process component of Fourteenth Amendment is implicated where the right infringed is not covered by another amendment).

The Supreme Court addressed the standard of analysis of such a claim in *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998). There, the decedent was the passenger on a motorcycle that was involved in a high-speed chase with the police. The chase ended when the motorcycle tipped over; however, the police officer in pursuit

7

of the motorcycle was not able to brake in time to keep from running over the passenger, and the passenger was killed. The parents of the decedent brought a Section 1983 action against the police department for violation of the decedent's Fourteenth Amendment substantive due process rights. *See id.* at 836–37, 118 S. Ct. 1708.

The Supreme Court held that a police officer does not violate substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender; rather, the officer's conduct must "shock the conscience" in order to rise to the level of a due process violation. *See id.* at 854–55, 118 S. Ct. 1708. To determine what "shocks the conscience," the *Lewis* Court compared situations where officials have a reasonable opportunity to deliberate their actions prior to deciding how to proceed, with situations where officials must "act decisively and . . . show restraint at the same moment, and their decisions have to be made 'in haste, under pressure, and frequently without the luxury of a second chance.'" *Id.* at 853, 118 S. Ct. 1708 (quoting *Whitley v. Albers,* 475 U.S. 312, 320, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)). In the first circumstance, the Court provided the example of corrections officials who ignore an inmate's serious medical needs. There, the Court held "deliberate indifference" would amount to culpable conduct:

> As the very term deliberate indifference implies, the standard is sensible only when actual deliberation is practical . . . and in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare.

*Id.* at 851, 118 S. Ct. 1708.

In contrast, however, the Court held that a much higher standard of fault than deliberate indifference must be shown where officials quell a prison riot or are "forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 853, 118 S. Ct.

1708. In such circumstances, the official's actions "shock the conscience" *only* if force is employed "maliciously and sadistically for the very purpose of causing harm." *Id*., 118 S. Ct. 1708*.; see also Farmer v. Brennan,* 511 U.S. 825, 835–36, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (malicious or sadistic behavior entails unjustifiable, intentional conduct taken with the direct purpose of harming the victim). The *Lewis* Court held that "when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates the 'large concerns of the governors and the governed.'" *Id.* at 853, 118 S. Ct. 1708 (quoting *Daniels v. Williams,* 474 U.S. 327, 332, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)). "[H]igh speed chases with no intent to harm the suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." *Id*., 118 S. Ct. 1708. Consequently, the Court affirmed summary judgment in favor of the police officer involved in the lethal chase: "Regardless whether [the police officer's] behavior offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practice, it does not shock the conscience, and [the officer] [is] not called upon to answer it under § 1983." *Id.* at 855, 106 S. Ct. 662.

Thus, in situations wherein the implicated agents are afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action, their actions will be deemed conscience-shocking if they were taken with "deliberate indifference" towards the plaintiff's federally protected rights. *Id*. at 851, 118 S. Ct. 1708. In contrast, in a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation, public servants' reflexive actions "shock the conscience" only if they involve force employed "maliciously and sadistically for the very purpose of causing harm" rather than "in a

9

good faith effort to maintain or restore discipline[.]" *Id.* at 853, 118 S. Ct. 1708 (citation omitted).

The Court finds that the situation involving Deputy Dalton, Wilburn Gray, and Betty Sue Gray falls into the latter category of predicaments. *See McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002) (acknowledging *Lewis*'s scale of culpability and attendant due process standards). The dash camera clock shows that less than thirty seconds elapses between Deputy Dalton approaching the carport door and Wilburn Gray admittedly coming toward the glass door with a loaded weapon and opening the glass door into the carport where the officer was. Deputy Dalton did not have minutes, hours, days or months to deliberate his actions. This situation is the very definition of a "rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation." *Id.*, 118 S. Ct. 1708; *but see Brown v. Nationsbank*, 188 F.3d 579 (5th Cir. 1999). Actual deliberation in this situation was not practical.

Because the events in this case are more akin to the rapidly evolving situation as presented in *Lewis*, the correct standard for application in this due process context is whether Deputy Dalton's actions shock the conscience by employing force maliciously and sadistically for the very purpose of causing harm rather than in a good faith effort to maintain or restore discipline. *Id.* at 853, 118 S. Ct. 1708.

There is no proof in the record that Deputy Dalton's actions were maliciously or sadistically applied, taken with the direct purpose of harming Betty Gray. *See Farmer*, 511 U.S. at 835-36, 114 S. Ct. 1970) (malicious or sadistic behavior entails unjustifiable, intentional conduct taken with the direct purpose of harming the victim); *Pena v. Givens*, 637 F. App'x 775, 783 (5th Cir. 2015) (using the "malice" standard for Fourteenth Amendment substantive due process claim brought on behalf of a patient who died at a state-run psychiatric emergency room

while actively resisting treatment). While the outcome of the events of December 23 is tragic, there is no indication from the record that Dalton's actions were intentionally aimed to harming Betty Gray. On the record presented, no reasonable jury could conclude that Dalton's actions were "inspired by malice rather than merely careless or unwise excess of zeal." *Petta v. Rivera*, 143 F.3d 895, 901-02 n.5 (5th Cir. 1998); *see also Lewis,* 523 U.S. at 848, 118 S. Ct. 1708. Therefore, Plaintiffs have failed to put forth evidence of an element of their claim, i.e., that Deputy Dalton's actions shock the conscience because he maliciously or sadistically applied force for the very purpose of causing harm to Betty Gray. Plaintiffs' Fourteenth Amendment substantive due process claim fails.

    2. Fourth Amendment Illegal Arrest and Detention Claim against Dalton by Wilburn Gray

Wilburn Gray also suggests that Defendants deprived him of his Fourth Amendment right to be free from unreasonable seizure or arrest without probable cause. In particular, Gray argues that while he was held at the Alcorn County Jail from December 23 until December 26, no judicial hearing was held on probable cause, and the grand jury was never presented his aggravated assault charge. Therefore, with no indictment or judicial hearing confirming there was probable cause for his arrest, Gray contends his constitutional rights were violated. Defendants contend that because probable cause existed to arrest Gray, and Plaintiffs presented no evidence that Dalton was personally involved with the detention of Gray from December 23 through 26, Dalton did not unlawfully seize or detain Wilburn Gray.

It is clearly established Fourth Amendment law that an arrest must be based on probable cause. *Bosarge v. Mississippi Bureau of Narcotics*, 796 F.3d 435, 442 (5th Cir. 2015). Conversely, "[p]robable cause is a defense to a § 1983 claim based on an alleged false arrest." *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990). Therefore, "[t]o ultimately

prevail on his section 1983 false arrest/false imprisonment claim, [Gray] must show that [Dalton] did not have probable cause to arrest him." *Haggerty v. Texas Southern Univ.*, 391 F.3d 653, 655 (5th Cir. 2004) (citing *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001) ("The 'constitutional torts' of false arrest . . . and false imprisonment . . . require a showing of no probable cause.")); *Maier v. Green*, 485 F. Supp. 2d 711, 716 (W.D. La. 2007) ("[I]f there was probable cause for the arrest, a claim for false arrest is not viable.") (citations omitted). "Probable cause exists 'when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense.'" *Haggerty*, 391 F.3d at 655 (quoting *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir. 2001)).

Gray was arrested for aggravated assault on a police officer in the line of duty pursuant to Mississippi Code Section 97-3-7(2)(b). That statute states that a "person is guilty of aggravated assault if he (i) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life" or "(ii) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm." MISS. CODE. ANN. § 97-3-7(2)(b) (i-ii).

It is undisputed that Wilburn Gray discharged his weapon on the evening of December 23 toward Sheriff's Deputy Scott Dalton. While there may be some question as to Wilburn Gray's intent in firing the weapon, the officer was reasonable in believing that Gray was actively trying to assault him. *See Haggerty*, 391 F.3d at 655 (analyzing the facts and circumstances within the police officer's knowledge at the moment of arrest to determine probable cause). Accordingly, probable cause existed to support Gray's arrest for aggravated assault on a police officer. *See*

*Harris v. State of Mississippi*, 970 So. 2d 151, 156 (Miss. 2007) (finding evidence to support conviction of aggravated assault where defendant discharged his weapon only with intent to scare or in warning). Therefore, the arrest was reasonable, and the Fourth Amendment arrest claim against Deputy Dalton fails.

Defendants assert that Dalton was not personally involved in the detention of Gray from December 23 through 26 without probable cause hearing. However, as the arresting officer, Dalton was responsible for ensuring the arrestee was promptly brought before a magistrate. MISS. CODE ANN. § 99-3-17 ("Every person making an arrest shall take the offender before the proper officer without unnecessary delay for examination of his case"); *Jones v. Lowndes County, Miss.*, 678 F.3d 344, 351 (5th Cir. 2012). In 1975, the Supreme Court held that the Fourth Amendment requires a fair determination of probable cause to be made "promptly after arrest." *Gerstein v. Pugh*, 420 U.S. 103, 125, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975). Sixteen years later, the Court endeavored "to articulate more clearly" what the Fourth Amendment required. *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 56, 111 S. Ct. 1661, 114 L. Ed. 2d 49 (1991). This caselaw created two distinct presumptions. "Judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*" *id.*; *see also Powell v. Nevada*, 511 U.S. 79, 83, 114 S. Ct. 1280, 128 L. Ed. 2d 1 (1994), and the burden of showing otherwise falls to the person arrested. *McLaughlin*, 500 U.S. at 56, 111 S. Ct. 1661. In evaluating such contentions, "courts must allow a substantial degree of flexibility." *Id*. Beyond 48 hours, "the calculus changes." *Id.* at 57, 111 S. Ct. 1661. In that situation, "the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." *Id*.; *Brown v. Sudduth*, 675 F.3d 472, 477 (5th Cir. 2012).

The undisputed facts show that Gray was held for more than 48 hours without a probable cause hearing. Accordingly, it is the Defendant's burden to demonstrate that there existed a "bona fide emergency or other extraordinary circumstance" to explain the time spent incarcerated without a probable cause determination over 48 hours. *McLaughlin*, 500 U.S. at 57, 111 S. Ct. 1661. Deputy Dalton has provided no explanation for the delay, other than to assert his right to qualified immunity in this instance.

There is a clearly established right in this instance and the undisputed facts show that right to a probable cause hearing within a reasonable amount of time was violated. *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 410 (5th Cir. 2009). The second step of the qualified immunity analysis requires an analysis of whether the defendant's conduct was objectively reasonable. Because there has been no factual development of the steps Deputy Dalton took or the reasons for the delay for the probable cause hearing, the Court denies without prejudice the request for qualified immunity. *See Jones*, 678 F.3d at 351 (affirming the district court's denial of qualified immunity until a factual record developed).

    3. <u>Failure to Train against the County and Sheriff</u>

Plaintiffs next claim that Sheriff Charles Rinehart and Alcorn County "failed to provide adequate training and supervision to its officers" regarding the use of deadly force. In particular, Plaintiffs take issue with the Alcorn County Sheriff's Department's failure to adopt a policy that addresses the use of deadly force in the presence of third parties.

A municipality, or county in this instance, is liable only for acts directly attributable to it "through some official action or imprimatur." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) (establishing that a city is not liable under Section 1983 on the theory of respondeat

superior). As is well established, every *Monell* claim requires "an underlying constitutional violation." *Kitchen v. Dallas County, Tex.*, 759 F.3d 468, 483 (5th Cir. 2014); *see also Whitley v. Hanna*, 726 F.3d 631, 648 (5th Cir. 2013) ("[I]nadequate supervision, failure to train, and policy, practice or custom claims fail without an underlying constitutional violation."); *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 866–67 (5th Cir. 2012). Thus, because the Court has found no underlying constitutional violation for excessive force by Deputy Dalton under the Fourteenth Amendments, Plaintiffs' failure to train claim must fail as well.

   4. State Law Claims

Plaintiffs asserted several state law claims. Plaintiffs conceded their state law negligence, negligent infliction of emotional distress, and supervisory liability claims. However, Plaintiffs are still pursuing their wrongful death, gross negligence, and intentional infliction of emotional distress claims. Defendants contend they are exempt under the Mississippi Tort Claims Act from liability, or alternatively, that they are entitled to an on the merits dismissal.

The Mississippi Tort Claims Act provides immunity to government entities and employees that act within the course and scope of employment duties. Mississippi Code Section 11–46–9(1)(c) provides in pertinent part:

> A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim . . . [a]rising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of the injury.

This Court has stated that "[a]pparent in the language [of Miss.Code Ann. § 11–46–9] is that those officers who act within the course and scope of their employment, while engaged in the performance of duties relating to police protection, without reckless disregard for the safety and

well being of others, will be entitled to immunity." *McGrath v. City of Gautier*, 794 So. 2d 983, 985 (Miss. 2001). Indeed, the Mississippi Supreme Court noted that "[t]he purpose of Miss. Code Ann. § 11–46–9 is to 'protect law enforcement personnel from lawsuits arising out of the performance of their duties in law enforcement, with respect to the alleged victim.'" *Maldonado*, 768 So. 2d at 909 (quoting *City of Jackson v. Perry*, 764 So. 2d 373, 376 (Miss. 2000)).

The Mississippi Court has defined reckless disregard as "a higher standard than gross negligence and 'embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act.'" *Collins v. Tallahatchie Cty.*, 876 So. 2d 284, 287 (Miss. 2004) (quoting *Turner v. City of Ruleville*, 735 So. 2d 226, 230 (Miss. 1999)). "It typically involves a conscious indifference to consequences, and almost a willingness that harm should follow." *City of Jackson v. Shavers*, 97 So. 3d 686, 688 (Miss. 2012) (citing *Maye v. Pearl River Cty.*, 758 So. 2d 391, 394 (Miss. 1999)). "Reckless disregard is found where there is a deliberate disregard of an unreasonable risk and a high probability of harm." *Id*. (citing *City of Laurel v. Williams*, 21 So. 3d 1170, 1175 (Miss. 2009)). In analyzing whether the actions of law enforcement officers amount to reckless disregard of the safety and well-being of others, the Mississippi Supreme Court has held that "the nature of the officers' actions is judged on an objective standard with all the factors that they were confronted with, taking into account the fact that the officers must make split-second decisions." *Phillips v. Miss. Dep't of Pub. Safety*, 978 So. 2d 656, 661 (Miss. 2008); *Hinds County v. Burton*, 187 So. 3d 1016, 1022 (Miss. 2016). Also, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443 (1989)).

There is a question of fact, however, here as to whether Deputy Scott Dalton acted in reckless disregard for the safety and wellbeing of Betty Sue Gray while in the course and scope of his employment. A genuine issue of material fact exists as to whether Deputy Dalton spoke with Betty Gray and knew she was in close proximity to the door prior to discharging his weapon. These factual disputes need to be resolved before determining whether Alcorn County and Deputy Dalton are entitled to immunity on the wrongful death claim and gross negligence claim.

In Mississippi, an intentional infliction of emotional distress claim "focuses on the defendant's conduct, rather than the plaintiff's emotional condition. *Buchanan v. Gulfport Police Dep't*, Civ. Action No.: 1:08cv1299-LG-RHW, 2012 WL 1906523, at *15 (S.D. Miss. May 25, 2012). The conduct must be extreme; thus, "meeting the requisites of a claim for intentional infliction of emotional distress is a tall order in Mississippi." *Speed v. Scott,* 787 So. 2d 626, 630 (Miss. 2001). Here, there is no record evidence that Deputy Dalton intended to shoot Betty Gray, or that Dalton had any intent at all. Therefore, the Court dismisses this claim on the merits based on the record evidence.

*Conclusion*

Defendants' Motion for Summary Judgment [116] is thus, GRANTED IN PART and DENIED IN PART. The Court dismisses Plaintiffs' Fourteenth Amendment excessive force claims, the Fourth Amendment arrest claims, and failure to train claims. Left pending are the Fourth Amendment detention claims against both the County and Scott Dalton, and the state law wrongful death and gross negligence claims.

SO ORDERED, this the 6th day of January, 2017.

    /s/ Sharion Aycock  
    **U.S. DISTRICT JUDGE**